# IN THE SUPREME COURT OF IOWA

No. 07–1328

Filed September 10, 2010

JEREMY A. BROKAW, JOEL
BROKAW and KARMA BROKAW,

      Appellants,

vs.

WINFIELD-MT. UNION COMMUNITY
SCHOOL DISTRICT and ANDREW
MCSORLEY,

      Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Henry County, John G. Linn, Judge.

Plaintiffs seek further review of a court of appeals decision affirming the ruling of the trial court on their claims against defendant student athlete for assault and battery and against defendant school district for negligent supervision of athlete. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Martin A. Diaz and Elizabeth Craig of the Martin Diaz Law Firm, Iowa City, for appellants.

William J. Bush of Bush, Motto, Creen, Koury & Halligan, P.L.C., Davenport, for appellee Andrew McSorley.

Steve Ort of Bell & Ort, New London, for appellee Winfield-Mt. Union School District.

**BAKER**, **Justice**.

The plaintiffs, Jeremy Brokaw, and his parents, Joel and Karma Brokaw, seek further review of a court of appeals decision affirming the ruling of the trial court on their claims against Andrew McSorley for assault and battery and against the Winfield-Mt. Union Community School District (WMU) for negligent supervision of McSorley. The Brokaws contend the court of appeals erred in affirming the decision of the trial court, which they allege awarded inadequate compensatory damages against McSorley, incorrectly denied punitive damages, and erroneously dismissed their negligence claim against WMU. We find the trial court's award of compensatory damages was supported by substantial evidence, and substantial evidence also supported the trial court's finding WMU could not reasonably foresee that McSorley would intentionally attack another player. We find no merit to the Brokaws' claim that an award of punitive damages was mandatory and conclude that the trial court did not abuse its discretion in refusing to award punitive damages.

### I. Background Facts and Proceedings.

On January 13, 2004, the varsity basketball team from Iowa Mennonite High School played the varsity team from WMU. A tape of the game shows that during the second half of the game, Andrew McSorley, a guard for WMU, struck Jeremy Brokaw, an Iowa Mennonite player, causing him to fall to the ground. The tape also shows that Brokaw got up rather quickly and returned to the Iowa Mennonite bench. He returned to the game a short time later, but played poorly. Immediately after McSorley struck Brokaw, the referee called a technical foul on McSorley and ejected him from the game.

The Brokaws filed a petition at law seeking actual and punitive damages from McSorley and WMU. The petition alleged McSorley had committed an assault and battery against Jeremy Brokaw, and WMU was negligent in failing to control the conduct of McSorley.

A nonjury trial was held. The trial court found McSorley committed a battery upon Jeremy. Based upon the court's findings, it issued a judgment against McSorley in the amount of $13,000 for plaintiffs Joel and Karma Brokaw for past medical expenses, in the amount of $10,000 for plaintiff Jeremy Brokaw for loss of mind and body and past pain and suffering, and assessed McSorley the costs of that portion of the petition brought against him. The court did not award the plaintiffs any punitive damages. The plaintiffs' petition against WMU was dismissed.

The plaintiffs appealed the trial court decision. WMU cross-appealed. McSorley did not appeal from the judgment. We transferred the appeal to the court of appeals which affirmed all aspects of the trial court's decision. We granted further review.

**II. Discussion and Analysis.**

The Brokaws allege the trial court erred in: (1) calculating the compensatory damage award, (2) determining WMU could not reasonably foresee that McSorley would commit a battery upon an opposing player, and (3) concluding McSorley's actions did not warrant an award of punitive damages.

**A. Compensatory Damage Award.** Our scope of review of the trial court's decision is for correction of errors at law. Iowa R. App. P. 6.907. Under this scope of review, the trial court's findings of fact have the force of a special verdict and are binding on us if supported by substantial evidence. *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369,

372 (Iowa 1997). "We view the evidence 'in the light most favorable to the trial court's judgment.'" *Miller v. Rohling*, 720 N.W.2d 562, 567 (Iowa 2006) (quoting *Bates v. Quality Ready-Mix Co.*, 261 Iowa 696, 699, 154 N.W.2d 852, 854 (1967)).

The Brokaws allege substantial evidence does not support the trial court's compensatory damage award. The trial court awarded Joel and Karma Brokaw $13,000 for past medical expenses incurred as a result of Jeremy's injury. It also awarded Jeremy $5,000 for loss of function to his mind and body, and $5,000 for physical and mental pain and suffering. After reviewing the evidence presented by both parties, the trial court declared it had difficulty determining: (1) which of Jeremy's symptoms were caused by the battery, (2) what role subsequent injuries had on his symptoms, and (3) whether Jeremy had mitigated his damages.

We conclude substantial evidence supported the trial court's findings of fact relating to Jeremy's damages. Compensatory damages or actual damages are intended to compensate the victim for the injury sustained by another party's wrongful acts. *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988). The Brokaws' request for relief provides an itemization of damages to be paid by McSorley and WMU. The requested damages total more than 1.5 million dollars.

While the trial court found McSorley was responsible for a portion of Jeremy's damages, the court ultimately concluded the Brokaws failed to prove by a preponderance of the evidence that McSorley's battery proximately caused Jeremy to sustain damages for past lost wages, loss of future earning capacity, future medical expenses, future loss of full mind and body, and future medical pain and suffering. The court found Jeremy's claim for damages in these categories speculative.

At trial, the Brokaws introduced medical testimony that Jeremy suffers from postconcussion syndrome, and McSorley's assault was the most likely cause of this injury as Jeremy's symptoms started after the incident. Dr. George Phillips, Jeremy's treating physician, described postconcussion syndrome as follows:

> Postconcussion syndrome tries to show that there is a continuum of symptoms that related back to prior head trauma, and it's a diagnosis that tries to take into account the symptoms on the different scales. So . . . there are the physical symptoms of headache and nausea, there are the cognitive symptoms of memory problems and difficulty concentrating, there can be the emotional symptoms of mood swings and anxiety, depression or anger. So it really tries to account for all of those things.

The Brokaws also introduced several witnesses that testified Jeremy underwent a personality and behavior change after the assault. These witnesses indicated that before the incident Jeremy was an active leader at school and in his church community. The witnesses stated after the assault, Jeremy functioned at "fifty percent" of what he was capable of before the accident. He now has a hard time concentrating, becomes easily distracted, has memory problems, and has difficulty learning new information. In his last year of high school, the staff at Iowa Mennonite developed a special accommodation plan to address these symptoms.

The trial court, however, gave a detailed explanation for the compensatory damages it awarded the Brokaws. In its explanation, the court pointed out several concerns it had in determining the amount of damages proximately caused by McSorley's battery. The most important among those concerns are: (1) that Jeremy's symptoms are "problematic and difficult, if not impossible, to reconcile"; and (2) Jeremy's claim for damages involves potential second and subsequent injuries.

The trial court found Jeremy's symptoms were "unusual, inconsistent and varied. . . . [Some] appear consistent with postconcussion syndrome, but other symptoms create doubt in the Court's mind as to what is actually going on in Jeremy's life." In his medical records report, Jeremy consistently complained of headaches, but at various times he also complained of stomachaches, dizziness, vertigo, problems judging distance, weakness in his legs, short-term memory problems, difficulty sleeping, mood swings, altered smells and tastes, and hallucinations. These symptoms are not constant, but seem to wax and wane. Several reports indicate some of Jeremy's symptoms are not typical of postconcussion syndrome and are possibly caused by stress, anxiety, and other personality problems rather than the head injury. In a medical report, Dr. George Phillips writes that all of these symptoms "may" be related to Jeremy's postconcussion syndrome, but there is no definitive testimony that they in fact are the result of his head injury. There is substantial evidence to support the trial court's conclusion that "[i]t is virtually impossible . . . to determine what symptoms were actually caused by [McSorley's] action in striking Jeremy in the head with an elbow."

The trial court also found Jeremy's damages involve potential second and subsequent injuries. Medical records show Jeremy was largely symptom free ten days after the incident and was cleared by Dr. Jerold Woodhead to return to athletics four days later. The records also indicate that on February 2 or 3, 2004, Jeremy slipped and fell on ice. Though he did not hit his head, he did receive a significant jolt and three days later called Dr. Phillips complaining of intermittent headaches. Jeremy told Dr. Phillips that these headaches were not similar to those he experienced immediately after McSorley's attack. The record also

reveals Jeremy was diagnosed with a concussion on July 22, 2005, after he was hit in the head with an eighty-three-mile-an-hour pitch during a baseball game.

The Brokaws suggest Jeremy's subsequent injuries do not qualify as intervening causes because an intervening cause " 'exists when an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged tortfeasor's negligence, and that secondary act becomes the sole proximate cause of the plaintiff's injuries.' " *Seide v. State*, 875 A.2d 1259, 1270 (R.I. 2005) (quoting *Contois v. Town of W. Warwick*, 865 A.2d 1019, 1027 (R.I. 2004)). They claim these two incidents only exacerbated the injuries Jeremy sustained from McSorley's assault. They presented further evidence from Dr. Phillips which suggested that the initial head trauma put Jeremy at risk for greater injury in a subsequent event. In other words, the blow to Jeremy's head was a proximate cause of Jeremy's enhanced injuries from the fall on the ice because, but for the initial head injury, his subsequent injuries would not have been as severe. However, Jeremy had been symptom free since January 23, 2004, and told Dr. Phillips that the headaches from the February 2004 fall were different than those he suffered after the basketball incident. Dr. Phillips could not state with any degree of medical certainty that the two symptoms from the two events were in any way related. Similarly, there was no testimony linking the symptoms from the baseball incident to the basketball incident. Due to the conflicting medical evidence, we find that there was substantial evidence to support the district court's award of compensatory damages.

**B. Negligence Claim.** Again, we review the trial court's decision for correction of errors at law. Iowa R. App. P. 6.907.

1. *Duty.* The district court analyzed the Brokaws' claim against the school district in terms of whether WMU negligently supervised McSorley. For this proposition, the district court cited *Godar v. Edwards*, 588 N.W.2d 701 (Iowa 1999), a case decided under the Restatement (Second) of Torts. Although *Godar* describes this cause of action as a negligent supervision case, *Godar* was, in fact, a case involving the negligent control of a third party's actions, i.e., the alleged perpetrator of abuse upon a student. *Godar*, 588 N.W.2d at 707–08; *cf. City of Cedar Falls v. Cedar Falls Cmty. School Dist.*, 617 N.W.2d 11, 18 (Iowa 2000) (involving the negligent supervision of a student who hit another student with a golf cart). *Godar*, however, makes it clear that school districts have a duty of reasonable care in providing for the safety of students from the harmful actions of fellow students, a teacher, or other third persons. *Godar*, 588 N.W.2d at 708.

*Godar*, however, limited that duty of reasonable care "by what risks are reasonably foreseeable." *Id.* In *Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009), we adopted the principles of the Restatement (Third) of Torts: Liability for Physical Harm, which provide that "the assessment of the forseeability of a risk" is no longer part of the duty analysis, but is "to be considered when the [fact finder] decides if the defendant failed to exercise reasonable care." *Thompson*, 774 N.W.2d at 835 (citing Restatement (Third) of Torts: Liab. for Physical Harm § 7 cmt. J, at 97–98 (Proposed Final Draft No. 1, 2005) [hereinafter Proposed Final Draft]).

The case before us was decided prior to our adoption of the Restatement (Third) analysis in *Thompson.* Nonetheless, when the district court discussed breach of duty, it spoke of the forseeability that McSorley would assault another player, an analysis consistent with the Restatement (Third). On appeal, neither party has assigned the

analytical framework utilized by the trial court as error. Therefore, because the district court factored foreseeability into its analysis of breach rather than duty, we believe that an analysis under the Restatement (Third) is appropriately used on appeal.[1]

Turning then to the Restatement (Third), we held in *Thompson* that " '[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.' " *Thompson*, 774 N.W.2d at 834 (quoting Proposed Final Draft No. 1 § 7(a), at 90). Only "in exceptional cases" will this general duty of reasonable care not apply. *Id.* at 835. "An exceptional case is one in which 'an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases.' " *Id.* (quoting Proposed Final Draft No. 1 § 7(b), at 90). WMU does not argue that coaches as a class have no duty of reasonable care to control the actions of their players; it simply argues there was no foreseeable risk under the facts presented here. We conclude, therefore, that the general duty to exercise reasonable care applies here.

2. *Breach of Duty.* The Restatement (Third) specifically addresses the situation where a defendant may be held liable for the actions of a third party. Restatement (Third) of Torts: Liab. for Physical and

---

[1]Notwithstanding our decision to analyze this case using the framework of the Restatement (Third), we note that the result would be the same under the Restatement (Second). In *Godar* we held that a school district could not be held liable for negligent control of a third person if it " 'could not reasonably foresee that [its] conduct would result in an injury or if [its] conduct was reasonable in light of what [it] could anticipate.' " *Godar*, 588 N.W.2d at 708 (quoting *Marquay v. Eno*, 662 A.2d 272, 279 (N.H.1995)). Similarly, under the Restatment (Third), the risk is sufficiently foreseeable to provide a basis for liability when "the actor [has] sufficient knowledge of the immediate circumstances or the general character of the third party to foresee that party's misconduct." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 19 cmt. *f*, at 220 (2010).

Emotional Harm § 19, at 215 (2010) [hereinafter Restatement (Third)] ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). This section imposes liability where the actions of the defendant "increase the likelihood that the plaintiff will be injured on account of the misconduct of a third party." *Id.* § 19 cmt. *e,* at 218; *accord id.* § 30, at 542 ("An actor is not liable for harm when the tortious aspect of the actor's conduct was of a type that does not generally increase the risk of that harm."); *see also Royal Indem. Co. v. Factory Mut. Ins. Co.,* 786 N.W.2d 839, 850 (Iowa 2010).

The Restatement (Third) cites the following examples of situations where the defendant has created or increased the likelihood of injury by a third person:

> For example, the defendant's conduct may make available to the third party the instrument eventually used by the third party in inflicting harm; or that conduct may bring the plaintiff to a location where the plaintiff is exposed to third-party misconduct; or that conduct may bring the third party to a location that enables the third party to inflict harm on the plaintiff; or the defendant's business operations may create a physical environment where instances of misconduct are likely to take place; or the defendant's conduct may inadvertently give the third party a motive to act improperly.

Restatement (Third) § 19 cmt. *e,* at 218.

Two of the above examples may have specific application in a sports setting. For example, where a coach exhorts his players to injure an opposing team's star player, the coach has provided motivation for a player to act improperly. This situation does not exist here. This case does, however, present a situation where the defendant's "conduct may bring the third party to a location that enables the third party to inflict harm on the plaintiff."

The comments to section 19 of the Restatement (Third) recognize that in this situation, there is not a clean delineation between negligence and scope of liability. Restatement (Third) § 19 cmt. *c*, at 216–17 ("[T]he issues of defendant negligence and scope of liability often tend to converge."). As the comments explain:

> This Section is to a large extent a special case of § 3, and findings of defendant negligence under this Section hence largely depend on consideration of the primary negligence factors set forth in § 3. One factor is the foreseeable likelihood of improper conduct on the part of the plaintiff or a third party. A second factor is the severity of the injury that can result if a harmful episode occurs. The third factor concerns the burden of precautions available to the defendant that would protect against the prospect of improper conduct by the plaintiff or a third party. The same rationales of fairness and deterrence that in general justify negligence liability likewise render appropriate findings of actionable negligence under this Section.

Restatement (Third) § 19 cmt. *d*, at 217.

Where liability is premised on the negligent or intentional acts of a third party, however, as it is in this case, "the law itself must take care to avoid requiring excessive precautions of actors relating to harms that are immediately due to the improper conduct of third parties, even when that improper conduct can be regarded as somewhat foreseeable." *Id.* § 19 cmts. *g*, *h*, at 220–21. For example, a person "who merely loans a car to an ordinary friend for the evening is not guilty of negligence in entrusting the car, even though there is some abstract possibility that the friend might drive the car negligently or recklessly in the course of the evening." *Id.* cmt. *f*, at 219. However, if the friend has been drinking or has had his or her license revoked for previous episodes of deficient driving, a person could be negligent for lending the car. *Id.* The risk is sufficiently foreseeable to provide a basis for liability when "the actor [has] sufficient

knowledge of the immediate circumstances or the general character of the third party to foresee that party's misconduct." *Id.* at 220.

This principle is readily applied to an athletic coaching situation. During the course of a game, a coach must make the determination whether to allow a player to participate or bench that player. If the coach's knowledge of the immediate circumstances or the general character of the player should alert the coach that misconduct is foreseeable, then reasonable care would require the coach to make the decision to bench that player until the risk of harm has dissipated.

The district court, in applying the forseeability test, framed the question as whether the school district knew, or in the exercise of reasonable care should have known, that McSorley was likely to commit a battery against an opposing player. The plaintiffs assert that the trial court asked the wrong question in determining whether a breach occurred. The plaintiffs seek to frame the issue as whether WMU could reasonably foresee that McSorley could act in an unsportsmanlike manner sufficient to potentially cause injury to another, while the trial court framed the issue as whether WMU could foresee that McSorley would intentionally strike another player in a violent fashion.

That physical contact, even intentional physical contact, and injuries will occur in high school basketball games is somewhat foreseeable. In an analogous situation, the Massachusetts Supreme Court commented:

> In a general sense, one can always foresee that, in the thrill of competition and the heat of battle inherent in a contact sport, any player might some day lose his or her temper and strike an opposing player. If that possibility alone sufficed to make an assault on the field of play reasonably "foreseeable," schools and coaches would face liability every time they allowed their enthusiastic players to take the field against an opposing team. For these purposes, foreseeability must

mean something more than awareness of the ever-present possibility that an athlete may become overly excited and engage in physical contact beyond the precise boundaries of acceptably aggressive play.

*Kavanagh v. Trs. of Boston Univ.*, 795 N.E.2d 1170, 1178 (Mass. 2003).

Consistent with both the Restatement (Third) and *Godar*, the district court posed the proper question in determining whether a breach of duty occurred, i.e., whether the harm that occurred here—McSorley's intentional battery—was a foreseeable risk under the circumstances. The Brokaws' true challenge, therefore, is one of fact. *Thompson*, 774 N.W.2d at 835; *see also Vaillancourt v. Latifi*, 840 A.2d 1209, 1215 (Conn. App. Ct. 2004).

3. *Sufficiency of the evidence.* The trial court's findings of fact, viewed in the light most favorable to the trial court's judgment, have the force of a special verdict and are binding on us if supported by substantial evidence. *Jones*, 569 N.W.2d at 372. "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Raper v. State,* 688 N.W.2d 29, 36 (Iowa 2004) (citation omitted).

The question of whether WMU breached its duty of care turns on WMU's knowledge of McSorley's general character or the nature of the immediate circumstances, a question of fact. Restatement (Third) § 8, at 103. On these factual issues, the district court determined that "WMU officials did not know, nor in the exercise of ordinary care should have known, that [McSorley] was likely to commit a battery against an opposing player."

The district court made the factual determination that WMU did not have sufficient knowledge of McSorley's general character to breach

its duty of care. Although WMU's athletic director admitted McSorley had a reputation for having a short fuse and believed it important to "keep an eye on him," there was conflicting evidence as to how much the school district and its agents knew about McSorley's reputation. The Brokaws highlight an alleged incident in a previous game against Danville where McSorley allegedly intentionally kicked a defenseless player in the head when the player was on the floor after a scramble for the ball. The trial court found this version of the incident to be unsubstantiated. At trial, the other player admitted he could not remember where McSorley allegedly kicked him. He also testified that he purposefully grappled with McSorley and wrestled him to the ground. After listening to this testimony, the district court also found the Danville player's version of the incident to be unsubstantiated and stated the incident "does not establish that [McSorley] was an aggressive or assaultive player."

There is substantial evidence to support the trial court's view that McSorley played intensely, but as the trial court stated, McSorley

> had never exhibited characteristics of being physically assaultive or being a dangerous individual. The previous incident between Andrew and Danville player Schlarbaum does not establish that Andrew was an aggressive or assaultive player. . . . Andrew never previously fouled out of any basketball game, and only once previously received a technical foul, and that was for cursing. Andrew has never been a discipline problem, never had previously gotten into a fight, and did not have a reputation for being an aggressive player.

The evidence the Brokaws highlight shows McSorley was an intense player, even one who tended to become frustrated or had a short fuse; however, this evidence does not necessarily mandate a factual finding as a matter of law that based on knowledge of McSorley's general

character it was foreseeable he was likely to commit battery on other players.

The Brokaws also allege that prior to assaulting Jeremy the immediate circumstances should have alerted WMU to the likelihood that McSorley would commit an assault. Brokaws assert that McSorley took a swing at another player within view of the coaches' bench and engaged in an egregious undercutting foul. After reviewing the videotape of the game several times, the district court determined both of these claims were unsubstantiated. The district court came to these conclusions after a full trial and review of all the evidence. The district court, as the fact finder, determines witness credibility and the weight of the evidence as a whole, *State v. Laffey*, 600 N.W.2d 57, 59 (Iowa 1999), and we will not disturb the district court's findings if they are supported by substantial evidence. *Meyers v. Delaney*, 529 N.W.2d 288, 289–90 (Iowa 1995).

The trial court found McSorley always played basketball intensely, but not aggressively, and WMU could not have foreseen that he would commit a battery against Jeremy Brokaw. While reasonable minds could differ on the factual determinations, we have reviewed both the trial testimony and the videotape of the game and conclude there was substantial evidence in support of the district court's findings.

Because we find that the trial court applied the correct legal standard and substantial evidence supports the court's findings of fact, we do not address WMU's cross-appeal.

**C. Punitive Damage Award.** Finally, the Brokaws claim the trial court erred in its denial of punitive damages. The Brokaws' sole contention is that "[t]he trial court had to impose punitive damages and it was error to refuse to do so," i.e., that the award of punitive damages is mandatory where a battery is found.

The Brokaws cite only the Iowa State Bar Association instruction as authority for this proposition. The instruction cited, however, provides no support for the Brokaws' assertion that the "court had to impose punitive damages." Iowa Civil Jury Instruction 210.1 provides:

> Punitive damages *may* be awarded if the plaintiff has proven by a preponderance of clear, convincing and satisfactory evidence the defendant's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff.

Iowa Bar Ass'n, *Iowa Civil Jury Instructions* 210.1 (*available at* http://iabar.net) (emphasis added).

This is a correct statement of the law and is consistent with the statutory guidelines for imposing punitive damages found in Iowa Code section 668A.1(*a*) (2003). Neither the instruction nor the Code, however, provides support for the Brokaws' contention that punitive damages were mandatory in this instance.

"[A] key feature of punitive damages [is] that they are never awarded as of right, no matter how egregious the defendant's conduct." *Smith v. Wade*, 461 U.S. 30, 52, 103 S. Ct. 1625, 1638, 75 L. Ed. 2d 632, 648–49 (1983). We too have long held that "[p]unitive damages are always discretionary, and are not a matter of right." *Berryhill v. Hatt*, 428 N.W.2d 647, 656 (Iowa 1988) (citing *Rowen v. Le Mars Mut. Ins. Co. of Iowa,* 282 N.W.2d 639, 661 (Iowa 1979)); *see also Lala v. Peoples Bank & Trust Co. of Cedar Rapids,* 420 N.W.2d 804, 807 (Iowa 1988) ("Punitive damages are awarded as punishment and as a deterrent to the wrongdoer and others. These damages are incidental to the main cause of action and are not recoverable as of right."). We therefore hold that to the extent the Brokaws assert the trial court committed error because punitive damages are mandatory, this argument is without merit.

Because the award of punitive damages is always discretionary, we review the trial court's refusal to award punitive damages for an abuse of discretion. *Wilson v. IBP, Inc.*, 589 N.W.2d 729, 732 (Iowa 1999) (" 'A plaintiff is never entitled to punitive damages as a matter of right; their allowance or denial rests entirely in the discretion of the trier of fact.' " (quoting *Ramada Inns, Inc. v. Sharp*, 711 P.2d 1, 2 (Nev. 1985))); *see also Peters Corp. v. N.M. Banquest Investors Corp.*, 188 P.3d 1185, 1197 (N.M. 2008) ("We review a trial court's decision not to award punitive damages for abuse of discretion, and we will only reverse that decision if it is 'contrary to logic and reason.' " (quoting *N.M. Hosp. Ass'n v. A.T. & S.F. Mem'l Hosps., Inc.*, 734 P.2d 748, 753 (N.M. 1987))).

Iowa Code section 668A.1 sets the standard for awarding punitive damages. This section provides that the conduct at issue must be a "willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(*a*). This willful requirement must be proven by a preponderance of clear, convincing and satisfactory evidence. *Id.* We have previously stated that in the context of section 668A.1, "willful and wanton" means

> "[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."

*McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)).

The trial court determined McSorley committed a battery upon Jeremy when McSorley "clearly and intentionally struck Jeremy . . . [by] us[ing] his elbow somewhat like a battering ram and purposely, intentionally sw[inging] it at Jeremy's head, striking him in the left side." This description indicates the court recognized that punitive damages

were available. The court denied punitive damages, however, after viewing all the evidence, stating:

> Although his battery of Jeremy was intentional, the context in which this unfortunate behavior occurred must also be considered. During the heat of a basketball game, Andrew acted in frustration and swung his elbow at Jeremy. The record contains no evidence that Andrew acted with personal spite, hatred, or ill will.[2]

The trial court took into account the nature of McSorley's action, characterizing it as a "split-second decision, in the heat of the moment" during a close basketball game and found that "although intentional, does not rise to the level of justifying an award of punitive damages." We find that the trial court did not abuse its discretion in refusing to award punitive damages.

**III.  Disposition.**

We find substantial evidence supported the trial court's award of compensatory damages and its finding WMU could not reasonably foresee that McSorley would intentionally attack another player. We find no merit to the Brokaws' claim that an award of punitive damages was mandatory under the facts of this case and conclude that the trial court did not abuse its discretion in refusing to award punitive damages.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

---

[2]The court also stated that the "intentional act does not rise to the level of demonstrating a willful or reckless disregard for Jeremy's rights." The Brokaws have not challenged this statement. In committing the battery, however, McSorley committed a wrongful act which necessarily entailed willful and reckless disregard for another's rights. The commission of a battery, however, merely allows, but does not mandate, the award of punitive damages. *See, e.g.*, *Fenwick v. Oberman*, 847 A.2d 852, 855 (R.I. 2004). If the threshold determination of "willful and wanton conduct" has been met, the court proceeds to a second step: whether in its discretion the facts of a particular case warrant the imposition of punitive damages. *See Smith*, 461 U.S. at 52, 103 S. Ct. at 1638, 75 L. Ed. 2d at 649; *see also McClure*, 613 N.W.2d at 230–31.